IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
February 5, 1999 Session

## SHELIA J. TROY v. WILLIAM TROY, ET AL.

**Appeal from the Chancery Court for Giles County**
**No. 9002      Jim T. Hamilton, Judge**

_____

**No. M1998-00989-COA-R3-CV - Filed January 4, 2002**

_____

This appeal involves a dispute between a woman and her former in-laws regarding the title to a tract of property in Prospect, Tennessee and the in-laws' accounting for $35,000 held for the benefit of the woman and her former husband. When she filed for divorce in the Chancery Court for Giles County, the woman also named her in-laws as defendants and alleged that they had misappropriated marital assets and breached a contract to convey the property in Prospect, Tennessee. After agreeing to an irreconcilable differences divorce, the woman proceeded with her claims against her former in-laws. Following a bench trial, the trial court held that the in-laws had accounted for all the funds being held for the benefit of the woman and her former husband and that the in-laws owned the disputed property. On this appeal, the woman takes issue with both of these conclusions. We have determined that the trial court properly found that the property belonged to the in-laws. However, we have also determined that the in-laws did not properly account for $892.15 of the funds they were holding. Accordingly, we modify the final order to award the woman a $892.15 judgment against her former in-laws.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Modified and Affirmed**

WILLIAM C. KOCH, JR., J., delivered the opinion of the court, in which BEN H. CANTRELL, P.J., M.S., and PATRICIA J. COTTRELL, J., joined.

M. Andrew Hoover, Pulaski, Tennessee, for the appellant, Shelia J. Troy.

Samuel B. Garner, Jr., Pulaski, Tennessee, for the appellees, William Troy, John Annessi, and Helen Annessi.

**OPINION**

**I.**

William Troy and Shelia Troy married in 1986. They first settled in Ms. Troy's home state of Alabama, but they moved to Wisconsin in 1988 to find better paying jobs. Once in Wisconsin, they turned to Mr. Troy's mother and stepfather, John and Helen Annessi, for assistance with their

housing arrangements. Mr. and Mrs. Annessi supplemented their income by rehabilitating old houses and selling them at a profit. Just as the Troys arrived in Wisconsin, Mr. and Mrs. Annessi were considering purchasing a house in Gull Lake, Wisconsin to rehabilitate and sell. They decided to let the Troys purchase the house and loaned them $5,000 for a down payment.

Ms. Troy had a daughter from an earlier marriage, and she and Mr. Troy had two children of their own. Mr. Troy began sexually abusing his stepdaughter in mid-1988. He was arrested in January 1990 and was later convicted for sexual assault on his stepdaughter and on the 13-year-old babysitter of his younger children. Mr. Troy received a mandatory 26-year sentence for these offenses.

Mr. Troy's arrest and conviction placed the Troys in a quandary. They had heard, rightly or wrongly, that the State of Wisconsin could attach all their assets to be used as restitution to his victims if he was convicted. They also needed money to pay for Mr. Troy's lawyers in the criminal proceeding and to provide funds for Ms. Troy and the children to live on while Mr. Troy was incarcerated. They also had other debts, including a particularly large debt for medical expenses. In Mr. Troy's words, "[w]e owed tons of money."

The most obvious source of funds was the Troys' house. They listed the house for sale, but no buyers came forward. In early 1990, Mr. and Mrs. Annessi, partly to help the struggling couple and partly to recoup the money they had already loaned, agreed to purchase the house for $35,000. Because of the concern that the State of Wisconsin and other creditors might claim the proceeds of the sale, the Troys and Mr. and Mrs. Annessi agreed to an arrangement whereby the Troys would convey fee simple title of their property to Mr. and Mrs. Annessi, and in return, Mr. and Mrs. Annessi would make $35,000 available to the Troys which they could draw against from time to time to pay their debts and other expenses.

The parties referred to this arrangement as a "trust fund." They never reduced their agreement to writing, and the accounting for the expenditures from the fund was equally informal. The parties agreed that part of the fund would be used to repay the loan that Mr. and Mrs. Annessi had already made to help the Troys purchase the house. The remainder of the money, in Mr. Troy's words, "was shipped to me and shipped to Shelia as we needed it until it ran out." According to Mr. Troy, "Whenever either one of us needed money, Mom [Mrs. Annessi] would write a check and keep it logged down so she would know where the money went to."

Mr. Troy entered a Wisconsin prison in January 1991. Soon thereafter, Ms. Troy decided to move closer to her family in Alabama. She and the children eventually moved into a rented house trailer in Prospect, Tennessee. Ms. Troy chose Giles County because she had friends living there and because her parents did not live too far away. In 1992, the owner of the property informed Ms. Troy that he intended to sell the property. Because she did not want to move, Ms. Troy suggested to Mr. Troy that he ask Mr. and Mrs. Annessi to purchase the property to make sure that their grandchildren would have a place to live until he was released from prison. Eventually, Mr. and Mrs. Annessi agreed to purchase the property in return for the Troys' agreement to pay a small amount of rent while Mr. Troy was in prison and then to buy the property after Mr. Troy was released from prison. Accordingly, in November 1992, Mr. and Mrs. Annessi purchased the

property in Prospect, Tennessee for $10,000. Despite her agreement to pay rent after her in-laws purchased the property, Ms. Troy never paid rent. When asked later why he did not evict her, Mr. Annessi said, "I didn't want to put the kids out."

Prison and child molestation do not long-term marriages make. In July 1995, Ms. Troy began what her lawyer called "a three-party divorce case" by filing a suit in the Chancery Court for Giles County against Mr. Troy and Mr. and Mrs. Annessi. Not only did Ms. Troy seek a divorce from Mr. Troy, but she also accused Mr. and Mrs. Annessi of breach of contract and misappropriation of funds. Among the relief she sought, Ms. Troy requested the court to divest her in-laws of the title to the property in Prospect, Tennessee and to vest the title in her.

Mr. and Ms. Troy were eventually able to agree on the terms of an irreconcilable differences divorce. In their marital dissolution agreement, they agreed that Ms. Troy would receive custody of the children and a lion's share of the personal property. They also agreed that neither party would pay spousal support and reserved the issue of child support until Mr. Troy was released from prison. They could not, however, agree about the disposition of the $35,000 in the "trust fund" or the title to the property in Prospect, Tennessee. Because Mr. Troy believed that the entire $35,000 had been spent and that Mr. and Mrs. Annessi owned the property, he relinquished his claims to the property and to any proceeds "derived from Wife's action against John and Helen Annessi." The trial court approved this marital dissolution agreement, and Mr. and Ms. Troy were divorced in April 1997.

Ms. Troy then proceeded with her suit against Mr. and Mrs. Annessi. She asserted two claims against her former in-laws. First, she insisted that they had not disbursed all the "trust fund" money and that she was entitled to the balance of the funds. Second, she insisted that Mr. and Mrs. Annessi had used trust fund money to purchase the Prospect property and, therefore, that the property should belong to her. Following a bench trial in March 1998, the trial court ruled that all the money in the "trust fund" had been disbursed and that Mr. and Mrs. Annessi had not purchased the prospect property with "trust fund" money. Believing that the trial court erred on both questions, Ms. Troy appealed.

## II.
### THE DISBURSEMENT OF THE "TRUST FUND" MONEY

Ms. Troy takes issue with the trial court's conclusion that no money remained in the "trust fund" from the sale of the Troys' Wisconsin home. She asserts that the trial court "made several computational errors" when it determined that the entire $35,000 had been paid out by the time of the March 1998 trial and that the record shows that $5,586.15 remained in the trust fund at the time of trial. We turn to the record for the answer to this issue.

Ms. Troy's evidence regarding the distribution of the $35,000 in the "trust fund" is summarized in Exhibit 1, her handwritten tabulation of the distributions from the trust fund between January 4, 1990 and December 30, 1995. According to Ms. Troy, Mr. and Mrs. Annessi had disbursed $29,413.85, leaving a $5,586.15 balance in the fund. Mr. and Mrs. Annessi agreed with all these recorded expenditures except for the purported November 1992 expenditure of $10,000 to purchase the property in Prospect, Tennessee. Accordingly, excluding the disputed $10,000

expenditure, Ms. Troy and Mr. and Mrs. Annessi agreed on $19,413.85 of the distributions from the "trust fund" listed in Ms. Troy's tabulation, leaving $15,586.15 in dispute.

At trial, Mr. and Mrs. Annessi claimed that they had disbursed $16,009.51 from the "trust fund" that was not reflected on Ms. Troy's tabulation. If Mr. and Mrs. Annessi substantiated this claim, the evidence would not preponderate against the trial court's conclusion that Mr. and Mrs. Annessi had expended all of the $35,000 on behalf of either Mr. Troy or Ms. Troy. The evidence regarding the $16,009.51 in additional expenditures focused on ten types of expenditures. Ms. Troy took specific issue with only three types of expenditures totaling $5,434,51. We have reviewed the record regarding the remaining seven types of expenditures totaling $10,575 and find that the evidence fully supports the trial court's conclusion that these expenditures were properly deducted from the trust fund because they benefitted either Mr. Troy or Ms. Troy.[1]

We now turn to the $5,434.51 in expenditures specifically disputed by Ms. Troy. These expenditures include: (a) $923.51 for the 1990 property taxes on the Gull Lake house, (b) $392 in storage charges for the Troys' personal property left in Wisconsin, and (c) $4,119 in payments to family members of inmates who were incarcerated with Mr. Troy. We have concluded that the evidence preponderates against the trial court's apparent conclusion that the first two expenditures were properly charged against the trust fund.[2]

Ms. Troy argues that the $923.51 in property taxes on the Gull Lake house should not have been charged to the "trust fund" because Mr. and Mrs. Annessi took title to the house in March 1990. We agree. From and after March 1990, Mr. and Mrs. Annessi owned the Gull Lake house and, therefore, paid the 1990 property taxes for their own benefit. The record contains no proof of an agreement or any other basis for concluding that the Troys had any responsibility for these 1990 property taxes. Accordingly, the record contains no evidence to support the trial court's conclusion that the 1990 property taxes on the Gull Lake house should have been charged against the "trust fund."

Ms. Troy also argues that Mr. and Mrs. Annessi could not substantiate $392 in storage fees for the personal property the Troys left in Wisconsin. Mr. Annessi rented several storage units in Wisconsin from 1991 to 1995. Because the Troys' used one of the units for part of the time, Mr. Annessi charged the "trust fund" a portion of the rental fees amounting to $2,208. Ms. Troy's tabulation reflected this expense, but at trial Mr. Annessi insisted that he had actually paid $2,600 to store the Troys' personal property and produced cancelled checks to the storage company to

---

[1] These expenditures include: (1) $4,000 for the downpayment on the Gull Lake house; (2) $3,000 in legal fees connected with Mr. Troy's defense in the child molestation prosecution; (3) $500 to enable Ms. Troy to visit Mr. Troy in prison in 1993; (4) $1,125 to purchase Mr. Troy a television, typewriter, and other personal items for use in prison; (5) $1,000 for Ms. Troy's moving expenses from Wisconsin to Tennessee; (6) $200 for an airline ticket for the Troys' daughter; and (7) $750 in legal fees paid to Mr. Troy's lawyer in the divorce proceeding.

[2] We use the term "apparent" because the trial court did not make findings of fact with regard to the disputed expenditures in this case. Based on the trial court's conclusion that "there . . . [was] no money left in the account being administered by John and Helen Annessi," we assume that the trial court gave Mr. and Mrs. Annessi credit for all their claimed expenditures from the "trust fund."

support his claim. However, on cross-examination, Mr. Annessi was unable to explain how he determined that the additional $392 in charges related to the storage of the Troys' property rather than his own. In the absence of this explanation, there is no evidence to support Mr. Annessi's claim for the $392 in additional storage expenses.

The final disputed amount involved $4,119 in checks written at Mr. Troy's insistence between December 1992 and October 1995 and made payable to family members of several of Mr. Troy's fellow inmates.[3] The record contains conflicting explanations regarding the purpose of these payments. Mr. Troy never explained what these payments were for. Ms. Troy asserted that they were protection money paid to wives or girlfriends of other inmates to make sure that Mr. Troy was not injured in prison.[4] Mr. Annessi claimed that these checks were for "artwork purchases and supplies," and the record contains some evidence that Mr. Troy actually received several amateurish Native American paintings and other items such as beadwork key chains, a wallet, and a purse.

Ms. Troy has not demonstrated that Mr. Annessi improperly charged the $4,119 in payments to the wives or girlfriends of other inmates against the "trust fund," even if we accredit her testimony that these payments were extorted from Mr. Troy's family to assure that no harm befell him while in prison. It is clear that the payments were for Mr. Troy's benefit. Because the money in the "trust fund" was to be used to benefit either Mr. Troy, Ms. Troy, or their children, payments made to prevent injury to Mr. Troy while he was in prison were consistent with the purpose for which the money was being held. Ms. Troy made one such payment herself; therefore, she cannot fault Mr. and Mrs. Annessi for making them as well. Based on our review of the record, we have determined that the evidence does not preponderate against the trial court's apparent conclusion that the $4,119 in payments to the wives and girlfriends of several of Mr. Troy's fellow inmates could properly be charged back to the "trust fund."

We have determined (1) that the evidence supports the trial court's apparent decision to permit Mr. Annessi to charge $4,119 back to the "trust fund" and (2) that the evidence preponderates against the trial court's apparent conclusion that the $923.51 in property taxes and the $392 in additional storage fees were also properly chargeable to the "trust fund." Accordingly, the record supports two conclusions: first that between January 1990 and December 1995, Mr. and Mrs. Annessi expended $34,107.85 for the benefit of either Mr. Troy or Ms. Troy[5] and second that Mr. Annessi has been unable to prove that the balance of the funds – $892.15 – was spent to benefit either Mr. Troy or Ms. Troy. Based on these conclusions, we find that the trial court erred by determining that Mr. and Mrs. Annessi had expended all of the "trust fund" money to benefit either

---

[3]Mr. Annessi testified without contradiction that "He'd [Mr. Troy] give us an address and tell us to send it [the check] there." Later, on cross-examination, Mr. Annessi testified that "William Troy asked me to send that money, and it was his money, so I did."

[4]In fact, Ms. Troy testified that she had also written a check at Mr. Troy's request to one of the women who received a check from Mr. Annessi.

[5]This amount does not include the $10,000 that Ms. Troy claims was used to purchase the Prospect property. It includes: $19,413.85 (the agreed payments in Exhibit 1) + $10,575 (the additional payments proved by Mr. Annessi that Ms. Troy did not dispute on appeal) + $4,119 (the alleged protection money that benefitted Mr. Troy).

Mr. Troy or Ms. Troy. On remand, the trial court is directed to enter an order granting Ms. Troy a judgment against Mr. and Mrs. Annessi for $892.15.

## III.
### THE TITLE TO THE PROPERTY IN PROSPECT, TENNESSEE

Ms. Troy also insists that the trial court should have awarded her title to the property in Prospect, Tennessee because Mr. and Mrs. Annessi used money from the $35,000 "trust fund" to purchase it and they agreed to hold it in trust for the Troys. The trial court declined to award the property to Ms. Troy because she could not produce a written trust agreement. While we do not agree with the trial court's reasoning, we have determined that it reached the correct result.[6]

### A.

The principal basis for the trial court's decision not to award Ms. Troy the property in Prospect, Tennessee was that "[t]here was never any written agreement entered into between the parties which created any type of trust agreement." Of course the lack of a written trust agreement is not fatal to Ms. Troy's claim because a trust may be created without a formal written instrument. As the Tennessee Supreme Court has held, "a trust may rest upon a parol agreement where the declaration of trust was made prior to or contemporaneous with a transfer, either by deed or by will, of an interest in realty." *Sanderson v. Milligan*, 585 S.W.2d 573, 574 (Tenn. 1979). Therefore, we find that the trial court erred as a matter of law by basing its decision on the absence of a written trust agreement.

However, the burden of proving an oral trust is quite heavy. To safeguard against fraud, the law requires that trusts founded on oral agreements must be proven by evidence of the clearest and most convincing character. *Sanderson v. Milligan*, 585 S.W.2d at 574; *Allen v. National Bank of Newport*, 839 S.W.2d 763, 765 (Tenn. Ct. App. 1992); *Linder v. Little*, 490 S.W.2d 717, 723 (Tenn. Ct. App. 1972). The existence of a trust requires proof of three elements: (1) a trustee who holds trust property and who is subject to the equitable duties to deal with it for the benefit of another, (2) a beneficiary to whom the trustee owes the equitable duties to deal with the trust property for his or her benefit, and (3) identifiable trust property. *Kopsombut-Myint Buddhist Ctr. v. State Bd. of Equalization*, 728 S.W.2d 327, 333 (Tenn. Ct. App. 1986). Accordingly, the proper inquiry in this case is whether Ms. Troy proved the existence of an oral trust regarding the property in Prospect, Tennessee by clear and convincing evidence. We have concluded that she did not.

### B.

The lynchpin of Ms. Troy's claim that the property in Prospect, Tennessee was being held in trust is her assertion that Mr. and Mrs. Annessi used "trust fund" money to pay for the property.

---

[6]This court may affirm a trial court's decision that reaches the correct result, irrespective of the trial court's reasons. *Continental Cas. Co. v. Smith*, 720 S.W.2d 48, 50 (Tenn. 1986); *First Am. Trust Co. v. Franklin-Murray Dev. Co.*, 59 S.W.3d 135, 142 (Tenn. Ct. App. 2001); *Kaylor v. Bradley*, 912 S.W.2d 728, 735 n.6 (Tenn. Ct. App. 1995).

According to Ms. Troy, the trust fund contained $20,452.80 in November 1992, more than enough to pay the $10,000 purchase price for the property. Mr. Annessi responds that less than $10,000 remained in the trust fund in November 1992. Based on our review of the record, we have concluded that reality lies somewhere between the parties' positions.

We have already determined in Section II of this opinion that Ms. Troy's accounting of the expenditures of the trust fund money did not include $14,694 in other expenditures made by Mr. and Mrs. Annessi on behalf of the Troys between January 1990 and December 1995. When we examine the timing of these additional expenditures, we find that four of them amounting to $8,791 were made prior to November 1992.[7] Accordingly, the amount of money remaining in the "trust fund" in November 1992 was not $20,452.80, as Ms. Troy claimed, but rather $11,661.80. This accounting rebuts Mr. Annessi's assertion that there was less than $10,000 in the "trust fund" in November 1992. However, while it demonstrates that there were sufficient funds in the "trust fund" to purchase the property, it does not necessarily prove that Mr. and Mrs. Annessi used "trust fund" money for the purchase. All the evidence, viewed in its most reasonable and sensible light, points in the other direction.

The conduct of the parties after November 1992 is inconsistent with Ms. Troy's assertion that Mr. and Mrs. Annessi used trust fund money to purchase the property in Prospect, Tennessee. If we accredit Ms. Troy's theory regarding the source of the funds used to purchase the property, there would have been a $1,661.80 balance in the trust fund after Mr. and Mrs. Annessi purchased the property in November 1992.[8] However, after November 1992, Mr. and Mrs. Annessi expended an additional $10,469.95 that benefitted either Mr. Troy or Ms. Troy. If Mr. and Mrs. Annessi had expended trust fund money to purchase the property, it would necessarily follow that their expenditures on behalf of the Troys after November 1992 could only have been gifts amounting to $8,808.15.[9]

The record contains no evidence that Mr. and Mrs. Annessi agreed to provide the Troys with a steady stream of funds over and above the proceeds from the sale of the Gull Lake house. To the contrary, the great weight of the evidence establishes that the only assistance Mr. and Mrs. Annessi ever agreed to provide the Troys consisted of (1) a loan to provide the down payment on the Gull Lake house, (2) the agreement to purchase the Gull Lake house for $35,000 and to hold the funds for the Troys' benefit, and (3) the agreement to purchase the property in Prospect, Tennessee and to rent it to Ms. Troy while Mr. Troy was imprisoned. Accordingly, evidence of the $10,469.95 in

---

[7]These expenditures include: (1) the $4,000 for the down payment on the Gull Lake house, (2) the $3,000 for Mr. Troy's legal expenses related to his criminal prosecution, (3) $791 of the $1,125 expended to purchase Mr. Troy a typewriter and other electronic equipment, and (4) $1,000 to help defray Ms. Troy's moving expenses to Tennessee.

[8]$11,661.80 (balance after deducting additional expenditures proved by Mr. Annessi) – $10,000 (purchase price of the property) = $1,661.80.

[9]$10,469.95 (post-November 1992 expenditures) - $1,661.80 (balance following purchase of the property) = $8,808.15.

payments that Mr. and Mrs. Annessi made after November 1992 undermines Ms. Troy's claim that Mr. and Mrs. Annessi used "trust fund" money to purchase the property in Prospect, Tennessee.

The record of the expenditures made by Mr. and Mrs. Annessi after November 1992 to benefit the Troys is inconsistent with Ms. Troy's insistence that Mr. and Mrs. Annessi used trust fund money to purchase the property in Prospect, Tennessee. Therefore, to succeed with her oral trust theory, Ms. Troy must produce other evidence that clearly and convincingly establishes that Mr. and Mrs. Annessi agreed to hold the property in trust for the Troys. This she has failed to do because all the testimony, save hers, establishes quite clearly that the parties never intended that Mr. and Mrs. Annessi would hold the property in trust for the Troys.

The parties had a loose understanding regarding the property in Prospect, Tennessee, but that understanding was not that Mr. and Mrs. Annessi would hold the property in trust. Both Mr. Annessi and Mr. Troy testified that they agreed that Mr. and Mrs. Annessi would purchase the property and rent it to Ms. Troy while Mr. Troy was in prison. Then, after Mr. Troy's release from prison, Mr. and Mrs. Annessi would sell the property to Mr. Troy for what they paid for it.[10] If anything, this testimony describes an option not a trust arrangement. The option was contingent on two things – Ms. Troy paying rent and Mr. Troy's release from prison. Because Ms. Troy never paid rent and Mr. Troy was not released from prison, Mr. and Mrs. Annessi's obligation to sell the property to Mr. Troy did not mature before the Troys were divorced. Accordingly, any right the Troys had to purchase the property lapsed when they divorced.

All the direct evidence regarding the purchase of the property in Prospect, Tennessee is consistent with the trial court's conclusion that Mr. and Mrs. Annessi owned this property in fee simple. Mr. and Mrs. Annessi purchased the property with their own funds. They placed the title to the property in their names. They used their own funds to pay the local taxes on the property. In short, Mr. and Mrs. Annessi's conduct throughout this proceeding has been consistent with their fee simple, unconditional ownership of the property. Accordingly, like the trial court, we find that Ms. Troy has failed to prove the existence of an oral trust regarding the property in Prospect, Tennessee.

**IV.**

We affirm the conclusion that Mr. and Mrs. Annessi own a fee simple interest in the property in Prospect, Tennessee and remand the case to the trial court with directions to enter a judgment for Ms. Troy and against Mr. and Mrs. Annessi for $892.15 and for whatever other proceedings consistent with this opinion may be required. We tax one-half of the costs of this appeal to Shelia

---

[10]Mr. Troy testified that "my mom bought it [the property], and I was going to pay her back the money [the purchase price] when I got out, of course, just so my wife and kids would have a place to stay." In similar fashion, Mr. Annessi explained that "Mike said if — when he got out, that he would buy it back from us. And I told him if she [Ms. Troy] paid rent on it and it didn't cost me anything, I would sell it back to him for what I paid for it. I wouldn't make a profit on it."

J. Troy and her surety and one-half, jointly and severally, to John and Helen Annessi for which execution, if necessary, may issue.

_____
WILLIAM C. KOCH, JR., JUDGE